STATE OF MISSOURI on the information of CARL E. WILLIAMSON, Relator, v. CHARLES R. BLACK, HERMAN NISWONGER, W. E. DAVIS, HARRY L. VELVICK, JEWELL N. HIGGINBOTHAM, RALPH SHELTON, LLOYD RUSSELL, RICHARD WOODWARD, LESLIE RUSSELL, as individuals, and THE PEOPLES' CONSOLIDATED BURIAL ASSOCIATION OF DONIPHAN, a purported Corporation.—145 S. W. (2d) 406.

Division One, December 11, 1940.

20

*Carl E. Williamson* for appellant.

*C. T. Bloodworth* for respondents.

*Robert J. Callahan amicus curiae.*

22

PER CURIAM:—This is an information in the nature of *quo warranto* seeking forfeiture of the corporate charter and dissolution of the Peoples Consolidated Burial Association. Judgment was entered discharging respondents and relator has appealed.

The Burial Association was incorporated, by *pro forma* decree in circuit court, under Section 5014, R. S. 1929 (3 Mo. Stat. Ann. 2301), as "an association for benevolent, scientific, fraternal and beneficial purposes." It is relator's contention both that Section 5014 is unconstitutional and void because it is in conflict with Section 21, of Article 10, of our Constitution; and that the Burial Association has misued its franchise by conducting a business which is in fact life insurance, and "does not come within the classification of associations for benevolent, religious, scientific or educational purposes."

Because of the view we take, it is unnecessary to mention other contentions.

■ Section 21, Article 10, Constitution, provides: "No corporation, county or association, other than those formed for benevolent, religious, scientific or educational purposes, shall be created or organized under the laws of this State, unless" the taxes therein provided are paid. This court has held "that the Legislature has no power to authorize the evasion of the payment by allowing corporations to be organized under this benevolent law;" that "the payment could not be avoided by reason of a legislative declaration that the corporation was one formed for benevolent purposes, when the law under which it was brought into existence showed that it was a money-making institution;" and that "corporations not falling within one of the four classes (benevolent, religious, scientific or educational) must be organized, if at all, under some law providing for capital stock." [State ex rel. Henderson v. Lesueur, 99 Mo. 552, 13 S. W. 237; State ex rel. Richey v. McGrath, 95 Mo. 193, 8 S. W. 425.] We have also held that "it is a judicial question," whether or not a corporation is "former for either benevolent, religious, scientific, or educational purposes;" that "if, in point of fact, the corporation authorized by the act (involved) is not a corporation for benevolent purposes, the declaration of the Legislature that it is a benevolent corporation does not make it so;" and that it is "the province of the State to call in question the right to exercise the powers of a corporation or to challenge and oust a corporation from its right to exist and function as such." [Rockhill Tennis Club v. Volker, 331 Mo. 947, 56 S. W. (2d) 9; See, also, Prairie Slough Fishing & Hunting Club v. Kessler, 252 Mo. 424, 159 S. W. 1080; State ex inf. Hadley v. Meramec Rod & Gun Club, 121 Mo. App. 364, 98 S. W. 815; State ex inf. Wear v. Business Men's Club, 178 Mo. App. 548, 163 S. W. 901; In re Henry County Mutual Burial Assn., 229 Mo. App. 300, 77 S. W. (2d) 124.] Therefore, the first question is whether burial associations, authorized by Section 5014 to be incorporated under the classification of benevolent, religious, scientific or educational corporations are in fact corporations of such character or whether they actually are business corporations.

■ Section 5014, and also Sections 5015-5019, R. S. 1929, were enacted in 1917 (Laws 1917, p. 228) by an act entitled: "An Act to provide for the incorporation and regulation of burial *insurance* associations, exempting the same from the provisions of Chapter 61, Revised Statutes of Missouri (Chapter 37, R. S. 1929) and amendments thereto, and fixing penalties for its violations." (Our italics.) The first sentence, of Section 1 of the Act (now Sec. 5014), then read: "Associations may be incorporated under the provisions of Article 10, Chapter 33, Revised Statutes Missouri, 1909 (now Art. 10, Chap. 32, R. S. 1929), for the purpose of furnishing funeral

24

or burial benefits for their members, provided that no such benefit shall exceed the sum of one hundred dollars for the funeral or burial of any one member.'' (This maximum was changed to three hundred dollars by the amendment of 1925; Laws 1925, p. 166.) The second sentence (as now) provided for exemption ''from the provisions of the general insurance laws of this State;'' while the third (as now) required incorporation of existing associations within ninety days, and provided thereafter for incorporation only of associations having ''applications for at least three thousand memberships, with at least one month's dues paid on each application.'' The 1925 amendment added the last two provisos of present Section 5014, containing restrictions on rates and memberships and providing penalties for violation. The first proviso is: ''Provided, that no member shall be admitted into any such association who, at his or her last birthday, was over age of 65 years, and that the premium or dues collected by every such association shall increase at the same as, or a greater rate than, premiums are increased from 10 years to 50 years.'' Sections 2 to 6 of the original act have not been changed and are now Sections 5015-5019. It will be noted that the title to the original act limited its application to ''burial *insurance* associations.'' Therefore, this act could only authorize associations, which operated on an *insurance* basis, to be incorporated under it. [Sec. 28, Art. 4, Mo. Const.; Hunt v. Armour & Co., 345 Mo. 677, 136 S. W. (2d) 312, and cases cited.] The insurance character of this business is recognized by the provision of the act exempting such associations from the general insurance laws. This insurance basis is emphasized by the amendment of 1925 requiring higher premiums at advanced ages, and providing an age limit for membership. [Compare the assessment plan insurance statute, Section 5751, R. S. 1929, 6 Mo. Stat. Ann. 4406.] Section 5019 also recognizes the insurance basis of the benefits authorized by prohibiting certain kinds of insurance companies or societies from coming under the provisions of the act.

The McGrath case, supra, held that the Legislature could not authorize building and loan associations to be incorporated as benevolent corporations, because the business of a building and loan company ''is not to promote benevolence or charity, but to better the pecuniary condition of its members or shareholders alone.'' This court said ''the nature or character of corporations authorized to be created by the Act of 1887 is to be determined from the purpose to be accomplished and the business they are authorized to engage in.'' This act (Laws 1887, p. 111) provided for mutual saving fund, loan and building associations declared, by Section 12 thereof, to be ''benevolent associations'' exempt from the incorporation tax provided by Section 21, Article 10, Constitution, because they ''start without any paid-up capital, and . . . their members only pay each month an assessment, in proportion to shares, for the purpose

of furnishing a home to each of its members in turn, which assessments stop the moment that every member has thus been furnished with such a home." This court, however, said that this did not "characterize the association as one formed for benevolent purposes" because "the chief incentive to each stockholder is that he may benefit himself." Clearly that would be just as true of a burial association, operating on an insurance basis, as it would be of an association operating to provide insurance for any other purpose. Certainly the insurance business is no more to be classified as charity or benevolence than is the building and loan business. It would, of course, be possible to have a burial association operating on a charitable basis which could be properly classed as a benevolent corporation, but the statutes existing prior to 1917 provided ample authority for the incorporation of such an actual benevolent association. The Act of 1917 as amended (Secs. 5014-5019) no more requires such a basis than did the building and loan association Act of 1887, declared unconstitutional and void in the McGrath case.

In the Lesueur case, supra, it is said that "some degree of liberality must be allowed in the formation of those associations where all pecuniary profit is excluded." This court, therein, upheld the formation of a club whose primary "declared purposes is clearly educational," although "others seem to be added as matters of amusement, and incidental to the first." This court, however, held therein that "in so far . . . as Section 2834 (R. S. 1889) undertakes to allow corporations to be created for other benevolent, religious, scientific or educational purposes, it is void." That section (Section 1406, R. S. 1899, omitted in the 1909 revision) authorized incorporation, under the benevolent corporation laws, of "any association formed for the purpose of establishing a gymnasium, or club house, or for promoting boating, field sports, or other rational amusements, or for any other purpose not excluded by Section 2829." The Rockhill Tennis Club case, the Prairie Slough Fishing & Hunting Club case, the Meramec Rod & Gun Club case, and the Business Men's Club case, supra, all considered types of nonprofit associations, which could not be classified as benevolent, religious, scientific or educational corporations. Of course, there may be involved in attempts to be so classified not only avoidance of incorporation taxes, but also escape from regulation to which other like business corporations are or may be subject. It seems obvious that the Act of 1917, and present Sections 5014-5019, provide for incorporation, as benevolent corporations, of associations which would actually be business corporations authorized to operate solely upon an insurance basis. Therefore, these sections conflict with and violate Section 21, Article 10 of our Constitution, and we must hold them unconstitutional and void in so far as they are thus in conflict with the Constitution.

■ Moreover, the evidence in this case shows that this association, against which these proceedings were brought, is operating solely upon an insurance basis, and is not by any means one "where all pecuniary profit is excluded." Some members can profit at the expense, of others from the forfeitures (hereinafter shown to be provided) included in its policies. It certainly offends the purposes of the benevolent corporation laws in all the respects pointed out by the Kansas City Court of Appeals in the case of In re Henry County Mutual Burial Association, supra. The testimony of the secretary-treasurer of this association was that he (with two other men engaged, as he was, in the undertaking business) "organized this association to keep others from squeezing us clear out so we wouldn't have a chance for any business at all;" that "we had burial associations coming in all around us . . . and we organized it for our own protection;" and that "I'm in business, in the undertaking business . . . primarily, of course, to make money . . . If I can do anything that is legitimate and legal to aid my business naturally I'm going to do it." Agents were sent out to sell membership certificates, and an agent got "the first premium as his fee." When the association furnished the funeral service "they would reserve twenty per cent for their expenses . . . that was for the upkeep of. the association." The membership certificate provided: "When a member dies, those of the family in charge shall at once notify Charles R. Black, Secretary-Treasurer, Doniphan, Missouri, or Black's Mortuary, Corning, Arkansas, who shall furnish the service and the casket." The president, Lloyd Russell, undertaker at Piggott, Arkansas, said that he serviced most of the ·funerals in the east end of their territory and that Mr. Black serviced most of the rest; that they "haven't drawn the line" between them; but that they "do business all over southern Missouri;" and that the premiums he collected on certificates sold through him were deposited in the Piggott bank, while those collected by Mr. Black were deposited in the Corning bank. The association "made four assessments a year."

The by laws, made a part of the certificates and printed on the back thereof, contained qualifications for membership and provided for forfeiture and established values and assessment rates on different classes of certificates, as follows:

"2. Any person to be eligible for membership and certificate of benefit of the Association shall be at the time of making application for membership be in good health and free from any chronic disease and within the age limits hereinafter specified, and *any misrepresentations as to* age or *health condition forfeits all rights to benefits* from the Association.

"(a) Benefit certificates shall be issued in the following classes:

"Class F—10c for $40 payment, 3 months to 6 years.

"Class E—15c for $60 payment, 7 years to 12 years,

"Class D—25c for $100.00 payment 13 to 50 years.
"Class D—50c, ages 50 to 65 years.
"Class C—40c for $150 payment, 13 to 50 years.
"Class C—75c, ages 50 to 65 years.
"Class B—50c for $200.00 payment, 13 to 50 years.
"Class B—$1.00, 50 to 65 years.
"Class A—75c for $300.00 payment, 13 to 50 years.
"Class A—$1.50, ages 50 to 65 years."

The by laws also provided other restrictions, limitations and forfeitures, as follows:

"5. All member shall receive funeral, including services and casket in the amount specified in the class in which they held their benefit certificate.

"6. The services and casket to members holding benefit certificates with the Peoples Consolidated Burial Association, Inc., shall be up to the standard of, and in keeping of the services and caskets sold at similar prices by licensed embalmers and funeral directors of this and other towns in this territory. The funeral services to be furnished by this Association do not include any payment for any burial lot or plot in any cemetery. .

"(a) If more expensive funeral than that furnished by the Association is desired, it may be arranged for by the family of the deceased and the member's benefit applied on payment of same. .´ . .

"8. *Failure* of any member *to remit within fifteen days* from the date of the assessment shall automatically terminate his benefit certificate and they *shall thereby forfeit any and all benefits* thereunder and all benefits from the Association. . . .

"9. If at any time the total amount received from assessment of members is insufficient to pay the benefits and the authorized expense of the Association, then *the Association shall not be liable to* any member or *members for any benefit in excess of the total amount received from such assessments.* . . .

"(a) *Failure* of those in charge of a deceased member's body *to notify* the Secretary-Treasurer of the death of the member *until after* the *burial* of such deceased member *shall forfeit the deceased member's right to any benefits* from the Association."

The italicized portions of these by law provisions certainly demonstrate that this association is a business corporation, doing an insurance business and giving its members nothing for which they do not fully pay. It has no fraternal or lodge features whatever. There are also, as shown, many drastic forfeiture provisions which our insurance code specifically prohibits, in other kinds of insurance business, for the protection of the public. This association is, of course, in no sense a benevolent, religious, scientific or educational corporation within the meaning of those terms as used in Section 21, of Article 10 of our Constitution. It is, therefore, subject to ouster from its

franchise purported to be obtained for such purposes. Certainly also when conditions are such that undertakers feel they must organize such associations to protect their business, from other such associations already organized for the purpose of obtaining and channelizing such business, the situation calls for legislative remedy providing statutes for proper organization of associations conducting burial insurance business and for adequate regulation thereof in the public interest. Otherwise, many evils of the wildcat insurance era will return in this field. The record herein shows that there are 15,000 members of this association. What membership all such associations in this State have we do not know, but the number is undoubtedly large and the interests of these people should be protected. The Sixty-first General Assembly will soon convene to begin its biennial session, and it can provide new laws, if necessary, or amend existing laws, so that these associations may be properly reincorporated and adequately regulated. Under the circumstances of this case, and to protect the interests of its members, the trial court could allow a reasonable time for this association to reincorporate under existing applicable statutes, if it be so advised. [See State ex rel. District Attorney General v. Mutual Mortuary Assn. (Tenn.), 61 S. W. (2d) 664, and cases cited.] Likewise, if necessary, the court could allow it reasonable time to take advantage of new legislation, if any, enacted in the coming session. The trial court could do this by withholding final action on judgment of ouster for a reasonable time to permit reorganization and reincorporation.

The judgment is reversed and the cause remanded, with directions to proceed in accordance with this opinion.